UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KATHERINE WRIGHT,

               Petitioner,

v.                                                              CASE NO. 06-12419
                                                                HONORABLE NANCY G. EDMUNDS
CLARICE STOVALL,

               Respondent.

_____/

## OPINION AND ORDER DENYING HABEAS CORPUS PETITION

Petitioner Katherine Wright has filed a *pro se* habeas corpus petition under 28 U.S.C. §

2254.  The habeas petition challenges Petitioner's state conviction for first-degree murder.

Respondent Clarice Stovall urges the Court through counsel to deny the habeas petition.  The

Court has concluded from a review of the pleadings and the state court record that Petitioner's

claims lack merit or are procedurally defaulted.  Accordingly, the habeas petition must be

denied.  **I.  The Facts**

Petitioner was charged with the murder of her estranged husband, Theodore Wright, Jr.

("Theodore" or "Theodore Wright"), at her home on Burns Street in Detroit, Michigan.  Wallace

Richards and his sister Paris Richards testified at Petitioner's trial that, in January or February of

2002, Petitioner asked them if they knew somebody who would beat up her husband for her.

Wallace thought that Petitioner was joking, but Petitioner said that she was tired of the fighting

and arguing.  Petitioner also asked Paris Richards whether she knew anybody who could do an

insurance job on her car.   A month or two later, Petitioner called Wallace Richards and asked

him where was the boy that was supposed to beat up her husband.  Wallace then gave Petitioner

Jawan Hayes' cell phone number.

The parties stipulated that, if Karen Simafranka testified, she would say that Theodore Wright had a life insurance policy for $52,500 and that Petitioner was the named beneficiary. Robert Sutton, Jr., and Angelo Wright, testified that, in March of 2002, Theodore said that he was giving Petitioner a deadline of April 1, 2002, to decide whether she wanted to be married to him. Theodore intended to file for divorce and change the beneficiary on his life insurance policy if Petitioner decided she did not want to remain married.

The murder occurred about 10:30 p.m. on April 1, 2002. Police Officer Kristopher Hernden was dispatched to the crime scene where Petitioner informed him that a carjacking occurred when her husband went outside to get something from her car. She observed two people from inside the house. Then she heard gunshots, and her gold-colored Pontiac was missing.

Petitioner provided a similar description of the incident to Sergeant Paul Jones at 12:10 a.m. on April 2, 2002. Petitioner was extremely calm and matter of fact at the time. Petitioner informed Sergeant Mariann Stevenson that she had sent Theodore out to the car to get something.

In a subsequent statement to Officer Anthony Jackson on April 3, 2002, Petitioner admitted that she had talked to her friend Paris Richards about having someone beat her husband. According to Petitioner, an acquaintance of Paris's brother Wally offered to beat her husband and to make it look like a robbery. Petitioner claimed that she did not tell the man to kill her husband. Instead, she made it clear to the man that she only wanted her husband beat up because her husband had beat her and she wanted him to know what it felt like. After the

shooting, she called the man and asked him why he shot her husband, took her car, and left his own car down the street. Petitioner denied telling the man that she would pay him from her husband's insurance money, and she claimed that she did not tell the police about her plan because she thought the man or someone else would kill her.

Officer Matt Fulks testified that, approximately an hour after hearing a dispatch concerning a suspected carjacking on April 1, 2002, he saw the car engulfed in flames. A number of citizens who had gathered in front of Petitioner's house showed the police a blue Pontiac car parked down the street. The car, which was later impounded, was registered to Jawan Hayes. On April 2, 2002, Jawan Hayes called Officer Hernden and stated that his vehicle had been stolen and he wanted a property release form for his vehicle. When Hayes arrived at the police station, Officer Hernden escorted Hayes to police headquarters for questioning.

Hayes told Officer Lance Newman that he went to Petitioner's home with Dathan Price and a "big fella" named "D.J." According to Hayes, D.J. had a shotgun, and Price had a .44 revolver, which Price used to shoot the victim. Officer Newman later learned that D.J. was David Allen, who was elsewhere during the crime. Thus, Hayes' statement to Officer Newman did not comport with the officer's investigation.

In another statement to the police, Jawan Hayes stated that he had agreed to take Dathan Price to the house on Burns Street after Price announced his intention to commit a robbery. Hayes also admitted that he supplied the .44 revolver used in the shooting, but he claimed that Price and D.J. did the shooting.

Carnell Hayes informed the police that he saw Jawan Hayes with a .44 and a 12-gauge shotgun on the night in question. The medical examiner testified that the victim was sustained

six gunshots wounds and one shotgun wound.

The most damaging evidence came from Daniel Bizovi, who was confined for a time in a cell next to Dathan Price at the Wayne County Jail. Price informed Bizovi that Petitioner had contacted Jawan Hayes and that Hayes contacted Price for help with the situation. The original plan was to beat up Petitioner's husband because Petitioner wanted her husband to know what it felt like to be beat. They decided to make it look like an armed robbery and a beating. Petitioner planned to reward Jawan Hayes with $5,000 from some insurance money, and Dathan Price was expected to get about $500 of that money. Petitioner and Hayes tried to arrange a situation where Theodore Wright would be visiting Petitioner. Hayes had fallen in love with Petitioner and wanted Theodore out of the picture. On the night of the shooting, Petitioner called Hayes and said that Theodore had arrived. Hayes picked up Dathan Price. He (Hayes) had a shotgun and a .44 in the car. The two of them went to Petitioner's home and got out of the car. When Theodore Wright walked out of the house, Hayes demanded his wallet and car keys. Hayes and Theodore got into a fight. Petitioner came outside to observe the fight and was screaming, "How does it feel to be beat?" Theodore, however, was taller and larger than Hayes and he rolled over on top of Hayes. This action frightened Price, who shot Theodore in the back. Hayes then stood up and began firing at Theodore with a revolver. He looked at Petitioner between shots as if he were trying to impress her or win her approval. Petitioner showed no remorse that her husband was killed or beat up; in fact, she was excited and happy to see that it was done. Hayes and Price left in Petitioner's car. Petitioner called Hayes almost immediately and asked why he had taken her vehicle. Hayes then reminded Petitioner that they were supposed to make it look like a robbery and that it was her idea. Hayes and Price decided to report Hayes' car as stolen because

they were worried that somebody might have seen them get out of the car when they arrived at Petitioner's house. Price dropped off Hayes after the shooting and then burned Petitioner's car to destroy any evidence. He met up with Hayes later that night, and someone picked up the shotgun and the revolver.

Officer Lance Newman subsequently was summoned to speak with Daniel Bizovi at the Wayne County Jail. Although initially Newman did not fully accept what Bizovi was telling him, he later determined that Bizovi possessed information, which only Newman or members of his squad would know about the case. Newman found no evidence that Theodore Wright had been accused of, or charged with, domestic violence.

On the day after the shooting, Petitioner went to Theodore's home to get clothing for the burial. Petitioner also took Theodore's jewelry, pain medication, car keys, wallet, movies, and some papers. She was in a happy mood.

Petitioner also went to see Theodore Wright's union representative on the day after the murder. She inquired about Theodore's insurance. Although the union representative was under the impression that Petitioner wanted the money for burial expenses, Petitioner asked two or three times about making a claim for the money.

None of the three defendants testified. The only defense witness was Jawan Hayes' sister, who claimed that she and Jawan were playing card games at Jawan's girlfriend's home on the night of the murder and that Dathan Price stopped by to pick up Jawan's car keys.

## II. Procedural History

Petitioner was tried in Wayne County Circuit Court with her co-defendants, Jawan Hayes and Dathan Price. Petitioner and Hayes had the same jury, but Price had a separate jury. The

prosecutor's theory was that Petitioner aided and abetted the murder by planning it with Hayes, who enlisted Dathan Price's help.

On August 16, 2002, Petitioner was found guilty, as charged, of premeditated murder, felony murder, and armed robbery.[1]  The trial court sentenced Petitioner to ten to twenty years in prison for the armed robbery conviction and to concurrent terms of life imprisonment for the two murder convictions.  The court then vacated one life sentence.

The Michigan Court of Appeals affirmed Petitioner's murder convictions in an unpublished, *per curiam* opinion, but remanded the case on double jeopardy grounds.  The court of appeals directed the trial to vacate the armed robbery conviction because the armed robbery was the underlying felony for the felony murder and to modify the judgment of sentence to reflect a single murder conviction supported by two theories.  *See People v. Wright*, No. 246822, 2004 WL 2119686 (Mich. Ct. App. Sept. 23, 2004).  On June 28, 2005, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues.  *See People v. Wright*, 472 Mich. 938; 698 N.W.2d 398 (2005) (table).

Petitioner filed her habeas corpus petition on May 30, 2006.  Her claims are:

I.      The trial court abused its discretion and erred reversibly in refusing appellant's request to retain new counsel, to have new counsel appointed or to proceed without counsel.

II.     The trial judge abused her discretion in denying appellant's motion for severance, resulting in a violation of due process because a large amount of highly prejudicial evidence relevant to the co-defendants but not to appellant was heard by the jury.

---

[1]  Jawan Hayes was convicted of premeditated and felony murder, armed robbery, and felony firearm.  Dathan Price was convicted of felony murder, armed robbery, and felony firearm.

III.    Appellant was denied her state and federal due process right to a fair trial through prosecutorial misconduct, including denigration of the defense, appeal to the peace and safety of the community and sympathy for the victim.

IV.    The trial judge violated *Aaron*, diminished the prosecution's burden of proving the element of intent beyond a reasonable doubt, and denied Appellant a fair trial by giving inadequate instructions on aiding and abetting.

V.    Appellant's convictions for murder and armed robbery should be reversed because the evidence was insufficient as a matter of law to sustain a verdict of guilty beyond a reasonable doubt.

VI.    The trial court violated appellant's due process rights by admitting the non-testifying co-defendant's statements against interest, implicating the other co-defendant and appellant in the incident.

VII.    The trial court reversibly erred in overruling a defense objection to testimony that the deceased had expressed intent to change the beneficiary of his life insurance policy and to initiate divorce proceedings, as that evidence was inadmissible to show appellant's alleged motive or intent, and because the state of mind of the decedent was not material, violating appellant's constitutional rights to confrontation and due process of law.

VIII.    The cumulative effect of the errors committed at trial deprived appellant of her state and federal rights to a fair trial.

Respondent argues in her answer to the habeas petition that Petitioner's claim about the jury instructions is procedurally defaulted and that Petitioner's other claims lack merit.

## III.  Standard of Review

Petitioner is entitled to the writ of habeas corpus only if she can show that the state court's adjudication of her claims on the merits–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410 (emphasis in original). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409.

"Avoiding these pitfalls does not require citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam* opinion) (emphasis in original). Furthermore, section "2254(d) dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (quotation marks and citations omitted). In addition, "state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1)." *Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004).

## IV. Discussion

### A. Counsel

The first habeas claim alleges that the trial court abused its discretion when the court refused Petitioner's request to retain new counsel, to have new counsel appointed, or to proceed without counsel. The Michigan Court of Appeals upheld the trial court's decision and determined that, given Petitioner's equivocal request, the public's interest in the prompt administration of justice prevailed.

#### 1. Retained Counsel

Defendants in criminal cases enjoy the right to assistance of counsel, *Faretta v. California*, 422 U.S. 806, 807 (1975), and to "a fair opportunity to secure counsel of his [or her] own choice." *Powell v. Alabama,* 287 U.S. 45, 53 (1932). However, "[t]he Sixth Amendment right to counsel 'does not guarantee that a criminal defendant will be represented by a particular attorney.'" *United States v. Green*, 388 F.3d 918, 921 (6th Cir. 2004) (quoting *Caplin & Drysdale v. United States*, 491 U.S. 617, 624 (1989)). In other words, a criminal defendant has no right "to choose any advocate if the defendant wishes to be represented by counsel." *Wheat v. United States*, 486 U.S. 153, 159 n.3 (1988).[2]

When an accused seeks substitution of counsel in mid-trial, he must show good

---

[2] More recently, the Supreme Court held that "[d]eprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received" and that the erroneous deprivation of the right to counsel is a structural error. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148, 150 (2006). The Supreme Court published its decision in *Gonzalez-Lopez* after Petitioner's conviction became final, and the decision is not retroactive. *Rodriguez v. Chandler*, 492 F.3d 863, 865-66 (7th Cir. 2007). Therefore, this Court has not relied on the holding in *Gonzalez-Lopez*.

cause such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict with his [or her] attorney in order to warrant substitution.

Consideration of such motions requires a balancing of the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice.

*Wilson v. Mintzes*, 761 F.2d 275, 280 (6th Cir. 1985). "[A] court must beware that a demand for counsel may be utilized as a way to delay proceedings or trifle with the court." *United States v. Krzyske*, 836 F.2d 1013, 1017 (6th Cir. 1988).

Petitioner was afforded a fair opportunity to secure counsel of her own choice before trial. On the first day of trial she requested permission to (1) have her family retain another attorney, (2) have counsel appointed for her, or (3) to represent herself. She stated that she was very dissatisfied with her attorney, that she did not have good communication with him, that he did not visit her, and that she had no confidence in him. The trial court refused to appoint an attorney or to permit defense counsel to withdraw. The court said that Petitioner's current attorney was doing an excellent job and that he had filed every viable motion. (Tr. Aug. 8, 2002, at 6-9). Petitioner made no other request for substitute counsel.

The trial court's decision not to allow Petitioner to retain another attorney was justified by the lateness of the request and by the possibility that Petitioner was making her request to delay the proceedings. Moreover, Petitioner's attorney was prepared for trial and stated that he had talked to Petitioner. He considered the case to be a simple one because their theory was that Petitioner was not responsible for what ultimately happened. Defense counsel explained that he did not challenge Petitioner's statement to the police for strategic reasons: the statement minimized their exposure.

Petitioner has not shown a complete breakdown in communication or an irreconcilable conflict with her attorney. The Court therefore concludes that the trial court did not abuse its discretion or violate Petitioner's right to counsel by denying Petitioner's request to retain another attorney.

### 2. Appointed Counsel

Although an indigent defendant has the right to appointed counsel, *see, e.g., Gideon v. Wainwright*, 372 U.S. 335 (1963), a "defendant may not insist on representation by an attorney he cannot afford . . . ." *Wheat*, 486 U.S. at 159. Stated differently, "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *Gonzalez-Lopez*, 548 U.S. at 151. Therefore, the trial court did not violate Petitioner's constitutional right to counsel by refusing to appoint an attorney that Petitioner might have preferred.

### 3. Waiver of Counsel; Self Representation

"The Sixth Amendment . . . implies a right of self-representation." *Faretta*, 422 U.S. at 821. "While the Constitution 'does not force a lawyer upon a defendant,' it does require that any waiver of the right to counsel be knowing, voluntary, and intelligent." *Iowa v. Tovar*, 541 U.S. 77, 87-88 (2004) (citations omitted). The choice to represent oneself must be done clearly, unequivocally, and with eyes open. *Faretta*, 422 U.S. at 835; *United States v. Martin*, 25 F.3d 293, 295 (6th Cir.1994). There is a "strong presumption against waiver of the constitutional right to counsel." *Fowler v. Collins*, 253 F.3d 244, 250 (6th Cir. 2001). The extent to which the trial court probes the various factors affecting a waiver of counsel varies from case to case. *Id.* at 249. Petitioner made one request to represent herself, and she made the request on the first day of trial. The request was equivocal in that she also requested appointed counsel and an

opportunity to retain another attorney. She did not make it clear that she wanted to proceed *pro se*. Therefore, the trial court's inquiry was sufficient, and Petitioner's constitutional right to represent herself was not violated.

### B. Joint Trial

Petitioner alleges that the trial court abused its discretion when it denied her motion to sever her trial from that of her co-defendants. Petitioner asserts that she was prejudiced by the joint trial because her jury heard harmful evidence that was relevant only to her co-defendants. This evidence included: (1) Daniel Bizovi's testimony concerning what Dathan Price told him about the crime; (2) Police Officer Lance Newman's testimony that, according to Jawan Hayes, Dathan Price had said he was going to "do" somebody; and Investigator Frazer Adams' testimony that Price asked Hayes for transportation in order to "hit a lick," that is, rob someone. The Michigan Court of Appeals stated that Petitioner waived the alleged error and that, even if the issue was not waived, reversal was not warranted because the record failed to disclose actual prejudice.

"Joint trials play a vital role in the criminal justice system . . . ." *Richardson v. Marsh*, 481 U.S. 200, 209 (1987). "Whether the trial court erred in denying severance is generally a question of state law that is not cognizable on federal habeas appeal, for a criminal defendant has no constitutional right to severance unless there is a strong showing of prejudice caused by the joint trial." *Cummings v. Evans*, 161 F.3d 610, 619 (10th Cir. 1998) (internal and end citations omitted). This Court therefore looks to state law "to determine whether a motion to sever should have been granted." *Phillips v. Million*, 374 F.3d 395, 398 (6th Cir. 2004); *see also Hutchison v. Bell,* 303 F.3d 720, 731 (6th Cir. 2002) (stating that severance is governed by state law and that

state-law errors do not warrant habeas relief unless the error deprives the defendant of a fair trial).

In Michigan, severance is discretionary with the trial court. *People v. Hana*, 447 Mich. 325, 331; 524 N.W.2d 682, 684 (1994). Severance is required if the defendant clearly and affirmatively demonstrates through an affidavit or offer of proof that substantial rights will be prejudiced by a joint trial and that severance will rectify the potential prejudice. Mich. Ct. R. 6.121(C); *Hana*, 447 Mich. at 346; 524 N.W.2d at 690.

Petitioner had a different jury from Dathan Price, and Price's statement to the police was not read to Petitioner's jury. In addition, Daniel Bizovi's testimony was relevant to Hayes' and Petitioner's cases and likely would have been admissible even if Price had been tried separately.

Defense counsel's only objection to a joint trial with Jawan Hayes was that he did not know whether Hayes intended to testify and what he would say if he did testify. Counsel stated that he would have no objection to a joint trial if Hayes presented an alibi defense through other witnesses. (Tr. Aug. 5, 2002, at 6-7.) Jawan Hayes did not testify, and he presented an alibi defense through his sister's testimony. Although his statements to the police were read into the record, they implicated Dathan Price, not Petitioner. Therefore, Petitioner waived her right to a separate jury from Jawan Hayes.

Furthermore, none of the defendants had mutual antagonistic defenses. Jawan Hayes had an alibi defense. Dathan Price's defense was that he was merely present at the crime scene and had no involvement in the crimes. His attorney argued that Daniel Bizovi was a dishonest and untrustworthy witness. Petitioner maintained through counsel that she did not intend to rob or to kill her husband, but only to have him beat up.

The joint trial did not compromise a specific trial right, nor "prevent the jury from making a reliable judgment about [Petitioner's] guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Therefore, the state appellate court's conclusion -- that Petitioner failed to show actual prejudice from the joint trial -- was not contrary to, or an unreasonable application of clearly established federal law as determined by the Supreme Court.

## C. The Prosecutor

Petitioner alleges next that the prosecutor deprived her of her right to a fair trial. She claims that the prosecutor denigrated the defense, appealed to the peace and safety of the community, and expressed sympathy for the victim. The Michigan Court of Appeals reviewed some of these allegations for "plain error affecting substantial rights." Consequently, Respondent argues that, at least one of Petitioner's prosecutorial-misconduct claims is procedurally defaulted. The Court has found no merit in Petitioner's claims, and procedural default is not a jurisdictional bar to habeas corpus review of a meritless claim. *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), *cert. denied*, 546 U.S. 1100 (2006). Therefore, the Court will proceed to adjudicate the substantive merit of all Petitioner's prosecutorial-misconduct claims.

To prevail on her claims, Petitioner must demonstrate that the prosecutor's conduct infringed on a specific constitutional right or infected the trial with such unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). It is not enough to show that the prosecutor's conduct or remarks were undesirable or even universally condemned. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). On habeas review, the complained-of conduct must be both improper and flagrant, *Broom v. Mitchell*, 441

F.3d 392, 412 (6th Cir. 2006), *cert. denied*, __ U.S. __, 127 S. Ct. 1376 (2007), and "so egregious as to render the entire trial fundamentally unfair." *Cook v. Bordenkircher*, 602 F.2d 117, 119 (6th Cir. 1979). When determining flagrancy, courts must consider "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994).

### 1. Denigrating the Defense

Petitioner claims that the prosecutor denigrated the defense when she referred to Jawan Hayes' alibi defense as "a lie by" defense[3] and when she said, "Mr. Price, you find this funny?" during her direct examination of jailhouse informant Daniel Bizovi. Although prosecutors may not make unfounded and inflammatory attacks on opposing counsel, *United States v. Young*, 470 U.S. 1, 9 (1985), the remarks about which Petitioner complains did not denigrate Petitioner's defense. The play on the word "alibi" was a reference to Jawan Hayes' defense. Because Petitioner did not assert an alibi defense, the remarks, even if deliberate, could not have misled Petitioner's jury or prejudiced her case. Furthermore, in a recent case where the prosecutor

---

[3] The first time this occurred, the prosecutor stated that she mispronounced "alibi." (Tr. Aug. 15, 2002, at 202.) However, during her rebuttal argument, the prosecutor said:

> An alibi is what I call a lie by, a lie by. Alibi which a defendant or a criminal attempts -- the defendant tries to escape criminal responsibility. Easy to assert, hard as heck to disprove. All you do is get someone to say I was with so and so. Disregard it, ladies and gentlemen.

(Tr. Aug. 16, 2002, at 46.) The remarks followed the closing argument for Jawan Hayes, whose defense was that he was elsewhere when the crimes were committed.

described the defendant and his alibi witnesses as "liars," the Court of Appeals for the Sixth Circuit determined that the prosecutor's comments were proper. *See Cristini v. McKee*, __ F.3d __, __, No. 06-1606, 2008 WL 2129742, at *11-12 (6th Cir. May 22, 2008).[4]

The question, "You find this funny?"also could not have mislead Petitioner's jury. The question was directed at co-defendant Dathan Price, who apparently was smiling or laughing when Daniel Bizovi testified that Price told him that Petitioner had no remorse as a result of her husband's killing and beating. (Tr. Aug. 14, 2002, at 136.) The prosecutor's question to Price did not implicate Petitioner.

### 2. Appeal to the Public's Safety

Petitioner alleges that the prosecutor appealed to the jurors' concern for public safety when the prosecutor asked Police Officer Matt Fulks whether Fulks knew the officer who was killed in the precinct where Fulks worked. Officer Fulks simply answered, "Yes." (Tr. Aug. 13, 2002, at 51.) The prosecutor subsequently apologized to the court and to defense counsel for the question. She admitted outside the jury's presence that she had asked the question to empathize with Officer Fulks, who was the slain officer's partner. (*Id*. at 77-78). Even though the question was improper and irrelevant to the proceedings, it was an isolated and fleeting remark. No further reference was made to the slain officer, and the trial court sustained an objection to the question. The incident could not have prejudiced Petitioner's defense.

### 3. Appeal to Sympathy

Petitioner's final allegation about the prosecutor is that she pleaded for sympathy for the

---

[4] The Sixth Circuit noted that, while repeatedly calling witnesses "liars" was hardly praiseworthy, the comments, when viewed in context, were not improper because the prosecutor coupled his argument with a detailed analysis of the record.

decedent in her closing argument when she mentioned that the victim's children, father, and sister had lost a loved one and that the victim did nothing to deserve his early demise. (Tr. Aug. 16, 2002, at 5-6.) "Closing arguments that encourage juror identification with crime victims are improper. Similarly, a prosecutor illicitly incites the passions and prejudices of the jury when he calls on the jury's emotions and fears -- rather than the evidence -- to decide the case." *Johnson v. Bell*, __ F.3d __, __, No. 04-5377, 2008 WL 1862326, at *13 (6th Cir. Apr. 29, 2008) (citations omitted).

The prosecutor in *Johnson* stated in his closing rebuttal argument that the twelve-year-old victim had gone to school with the prosecutor's daughter. The prosecutor went on to say that the victim could have been his or one of the juror's children and that anyone of them could have been shot and killed.

The prosecutor in Petitioner's case expressed some sympathy for the victim and the victim's family, but the remarks did not begin to approach the remarks made in *Johnson*. Furthermore, Theodore Wright's father previously testified that his son had five children and was only thirty years old when he died. The Court concludes that the prosecutor's remarks were not improper.

Even if the remark were improper, it was not egregious. Although the remark was deliberately made, nothing in the record indicates that it was meant to mislead the jury. Additionally, the evidence against Petitioner was substantial, and the trial court charged the jurors not to let sympathy or prejudice influence their decision. (Tr. Aug. 16, 2002, at 85.)

Petitioner complains of the following additional remarks, which the prosecutor made in her closing argument:

You know what sent chills up and down my spine?  When Daniel Bizovi
said that Dathan Price said April Fool's Day was the day.  Who would come up
with that?  Just like 9-11 when I had the -- we had the tragedy in New York and
Washington, 911 became -- because 911 it's something (sic) part of our society.
People connected the date with 9-11 that we all use for police and emergency
service.

It sent chills up and down my spine to realize that this was planned for
April Fool's Day.  I'll show you, according to Kat[h]erine Wright.  She who
laughs last laughs best.  This was planned for April 1st.

(*Id.* at 14.)   Although the reference to terrorists' attacks on the United States on September 11,

2001, was a potentially inflammatory remark, the connection between those events and

Petitioner's case is unclear.  The prosecutor seemed to be placing more emphasis on the fact that

Petitioner planned the murder for April Fool's Day.  The remarks were not extensive, and they

could not have misled the jury or prejudiced Petitioner, given their lack of clarity and the

strength of the evidence against her.

### 4.  Conclusion on the Prosecutorial-Misconduct Claims

The prosecutor's remarks were not so egregious as to render Petitioner's trial

fundamentally unfair.  Therefore, the state appellate court's conclusion that the prosecutor did

not deprive Petitioner of a fair trial did not result in a decision that was contrary to, or an

unreasonable application of, Supreme Court precedent.

### D.  The Jury Instructions

Petitioner contends that the trial court violated *People v. Aaron*, 409 Mich. 672; 299

N.W.2d 304 (1980), and diminished the prosecution's burden of proof by giving inadequate

instructions on aiding and abetting.  According to Petitioner, the instructions failed to inform the

jury that, if the acts of Jawan Hayes and Dathan Price were unanticipated and went beyond the

common enterprise, Petitioner was not guilty.  Petitioner argues that the instructions permitted

the jurors to convict her for murder and robbery even if they thought she intended only to participate in an assault on her husband.

Respondent asserts that this claim is procedurally defaulted. A procedural default is "a critical failure to comply with state procedural law." *Trest v. Cain*, 522 U.S. 87, 89 (1997). "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

The state procedural rule in question here is Michigan's contemporaneous-objection rule, which requires defendants to make timely and specific objections at trial in order to preserve their claims for appellate review. *See People v. Carines*, 460 Mich. 750, 761-68; 597 N.W.2d 130, 137-40 (1999); *People v. Grant*, 445 Mich. 535, 546; 520 N.W.2d 123, 128 (1994). A defendant must object to a jury instruction before the jury begins its deliberations in order to preserve an instructional error for appellate review. Mich. Ct. Rule 2.516(C); *People v. Gonzalez,* 256 Mich. App. 212, 225; 663 N.W.2d 499, 508 (2003).

Defense counsel did not object when the prosecutor asked for an instruction on aiding and abetting. Nor did he ask to have any particular language included in the instruction. (Tr. Aug. 15, 2002, at 209-12.) And, at the conclusion of the trial court's charge to the jury, defense counsel expressed satisfaction with the instructions as read to the jury. (Tr. Aug. 16, 2002, at 106.) The Michigan Court of Appeals therefore concluded that any instructional error was waived. The state court's reliance on the contemporaneous-objection rule was an adequate and

independent basis for the state court's conclusion because the rule was firmly established by the time of Petitioner's trial in 2002. Therefore, Petitioner must show "cause and prejudice" or a "miscarriage of justice" for this Court to consider the substantive merits of her claim.

Petitioner alleges that she is not required to show "cause and prejudice" because the error was "plain error." Under state law, however, an attorney's express approval of a jury instruction, as opposed to a failure to object, "constitutes a waiver that *extinguishes* any error." *People v. Carter,* 462 Mich. 206, 215-216; 612 N.W.2d 144, 149-50 (2000) (emphasis in original).

Furthermore, Petitioner admits that some of the instructions on intent and aiding and abetting were correct. The instructions stated that an aider or abettor must intend to help someone else commit the crime. The trial court stated that, to prove first-degree murder, the prosecution had to show that the defendant intended to kill Theodore Wright. The trial court also stated that felony murder required each of the defendants to have one of three states of mind: intent to kill, intent to do great bodily harm, or intent to create a high risk of death or great bodily harm, knowing that death or great bodily harm was the likely result. The trial court explained that armed robbery also required proof of a specific intent to cause a particular result. When considered as a whole, the instructions on aiding and abetting were sufficient to establish that the jury could convict Petitioner for murder and robbery only if the jurors thought she had the requisite intent or knew that her co-defendant intended to commit a murder or an armed robbery. Petitioner has not shown "plain error" or "cause" for her procedural default.

It is unnecessary to determine whether Petitioner was prejudiced as a result of the alleged constitutional error, because she has failed to establish "cause" to excuse her procedural default.

20

*Smith v. Murray*, 477 U.S. 527, 533 (1986); *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). The remaining question is whether a miscarriage of justice will occur from the Court's failure to adjudicate the substantive merits of Petitioner's claim.

The narrow exception for fundamental miscarriages of justice requires a habeas petitioner to demonstrate that the alleged constitutional error probably resulted in the conviction of one who is actually innocent of the underlying offense. *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Murray v. Carrier*, 477 U.S. 478, 496 (1986). "To be credible, such a claim requires [the] petitioner to support h[er] allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted h[er] in the light of the new evidence." *Id.* at 327.

Petitioner has not presented any new evidence to support a claim of actual innocence. Therefore, a miscarriage of justice will not occur as a result of the Court's failure to consider her claim on the merits.

### E.  Sufficiency of the Evidence

Petitioner alleges that her convictions for murder and armed robbery should be reversed because the evidence was insufficient to sustain the verdict.  Petitioner maintains that she did not contemplate an armed robbery or a shooting and that the evidence demonstrated only that she was involved in a simple assault.

#### 1.  *Jackson v. Virginia*

"[T]he Due Process Clause protects the accused against conviction except upon proof

beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). After *Winship,* the critical question on review of the sufficiency of the evidence to support a criminal conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. [T]his inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal citation and footnote omitted) (emphasis in original).

The Jackson "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law," *id*. at 324 n.16, and through the framework of 28 U.S.C. § 2254(d), *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002). "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v. Allen*, 201 Mich. App. 98, 100; 505 N.W.2d 869, 871 (1993).

### 2. Elements of the Crimes; Aiding and Abetting

In Michigan, jurors may convict a defendant of murder "only when they are convinced beyond a reasonable doubt that (1) the defendant intended (actually or impliedly) to kill and (2) circumstances of justification, excuse or mitigation do not exist." *People v. Morrin*, 31 Mich. App. 301, 323; 187 N.W.2d 434, 445 (1971). First-degree premeditated murder requires a finding that the defendant premeditated and deliberated the crime. *Id.*, 31 Mich. App. at 328; 187 N.W.2d at 448-49. Factors that may be considered when determining whether the defendant premeditated a murder are: "(1) the previous relationship between the defendant and the victim;

(2) the defendant's actions before and after the crime; and (3) the circumstances of the killing itself, including the weapon used and the location of the wounds inflicted." *People v. Plummer*, 229 Mich. App. 293, 300; 581 N.W.2d 753, 757 (1998).

> The elements of felony murder are:  (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in [the statute, including armed robbery].

*Carines*, 460 Mich. at 759; 597 N.W.2d at 136 (alteration in original).  "[M]alice can be inferred from the use of a dangerous weapon." *People v. Bulls*, 262 Mich. 618, 627; 687 N.W.2d 159, 165 (2004).  Armed robbery consists of: "(1) an assault, (2) a felonious taking of property from the victim's presence or person, (3) while the defendant is armed with a weapon described in the statute." *Carines,* 460 Mich. at 757; 597 N.W.2d at 135 (quoting *People v. Turner*, 213 Mich. App. 558, 569; 540 N.W.2d 728, 734 (1995)).

> Aiding and abetting encompasses

> all forms of assistance rendered to the perpetrator of the crime and comprehends all words or deeds which may support, encourage or incite the commission of a crime.  Mere presence, even with knowledge that an offense is about to be committed, is not enough to make one an aider or abettor.  To be convicted, the defendant must either himself possess the required intent or participate while knowing that the principal possessed the required intent.

*People v. Vicuna,* 141 Mich. App. 486, 495; 367 N.W.2d 887, 891 (1985) (internal and end citations omitted), *disapproved of on other grounds by People v. Dalessandro*, 165 Mich. App. 569, 574; 419 N.W.2d 609, 612 (1988).

### 3. Application

The Michigan Court of Appeals summarized the evidence as follows:

Testimony indicated that defendant Wright told Paris and Wallace Richards that she wanted to hire someone to beat the victim and do an insurance job on her car, and that she was referred to defendant Hayes, who volunteered to do it. Defendant Wright admitted to the police that she asked the victim to come to her house on the night he was killed there. [T]estimony indicated that the victim was planning to file for divorce from defendant Wright and remove her as a beneficiary under his life insurance policy. Additionally, [Daniel] Bizovi testified that, according to defendant Price, defendant Wright orchestrated the entire incident and instructed defendant Hayes to make it look like an armed robbery and a beating. Defendant Wright was going to pay defendant Hayes $5,000 out of her insurance money. Bizovi also testified that defendant Price told him that defendant Wright was very happy when the victim was shot. Witnesses also testified that defendant Wright attempted to collect the insurance policy benefits on the morning after the victim's death. She also took valuables from his apartment and did not seem sad or distraught.

*Wright*, 2004 WL 2119686 at *11. The Michigan Court of Appeals determined that "this evidence support[ed] an inference that defendant Wright intended for the victim to be killed, so she could collect the proceeds of the victim's insurance policy before he changed the beneficiary designation." The court of appeals concluded that "[t]he evidence was sufficient to support each of defendant Wright's convictions beyond a reasonable doubt." *Id.*

This Court agrees. The jury could have inferred that Petitioner premeditated the crime because she had a contentious relationship with Theodore Wright and she expressed an interest in harming him. She made it possible for Hayes and Price to rob and murder Theodore by inviting him to her home and then sending him out to the car when Hayes and Price arrived. Theodore was shot seven times, apparently as Petitioner looked on with approval. Although she maintained that she only wanted her` husband to be beaten, she displayed no remorse after he was killed.

There was evidence to support the armed robbery and felony murder conviction because the perpetrators robbed Theodore Wright of the car, which he was using, after they shot him.

The jurors could have inferred from evidence that Petitioner and Jawan Hayes intended to make the crime look like a robbery that, at a minimum, Petitioner created a very high risk of death or great bodily harm with knowledge that death or great bodily harm would occur.

A rational juror could have concluded from all the evidence that Petitioner aided and abetted Jawan Hayes in committing premeditated murder, felony murder, and armed robbery. Therefore, the state court's decision did not result in a decision that was contrary to, or an unreasonable application of, *Jackson.*

### F. A Co-Defendant's Hearsay Statements

Petitioner alleges that her right to due process was violated by the admission of Daniel Bizovi's testimony regarding what Dathan Price told Bizovi. Petitioner maintains that Bizovi's testimony was inadmissible hearsay and that her right to confront witnesses was violated because she had no opportunity to cross-examine Price. The Michigan Court of Appeals concluded that the trial court did not abuse its discretion by admitting the testimony as substantive evidence.

Whether the testimony was inadmissible hearsay under state law is inconsequential, because "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 68 (1991).

Petitioner's constitutional claim arises under the Confrontation Clause of the Sixth Amendment, which provides a criminal defendant with "the right physically to face those who testify against him, and the right to conduct cross-examination." *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987). "Where testimonial evidence is at issue . . . the Sixth Amendment demands

what the common law required:  unavailability and a prior opportunity for cross-examination."

*Crawford v. Washington*, 541 U.S. 36, 68 (2004).  "Testimonial evidence" includes "prior

testimony at a preliminary hearing, before a grand jury, or at a former trial" and statements made

during police interrogations.  *Id*.  "The proper inquiry . . . is whether the declarant intends to bear

testimony against the accused.  That intent, in turn, may be determined by querying whether a

reasonable person in the declarant's position would anticipate his statement being used against

the accused in investigating and prosecuting the crime."  *United States v. Cromer*, 389 F.3d 662,

675 (6th Cir. 2004).

The declarant here was Dathan Price, who approached Daniel Bizovi for help with his

criminal case while the two of them were fellow detainees in the county jail.  Although Bizovi

ultimately used information that he acquired from Price to acquire a favorable deal in his own

criminal case, Price's admissions did not amount to police interrogation.  *United States v. Moore*,

240 Fed. Appx. 699, 710-711, 2007 WL 1991060, at *9 (6th Cir.) (unpublished), *cert. denied*, __

U.S. __, 128 S. Ct. 553 (2007), *and cert. denied sub nom Herod v. United States*, __ U.S. __, 128

S. Ct. 1317 (2008), *and cert. denied sub nom Ocegueda v. United States*, __ U.S. __, 128 S. Ct.

1320 (2008).  Like the situation in *Moore*, Bizovi was not sent to interrogate Price, and he was

not promised anything before Price confided in Bizovi.  Furthermore, there is no indication in

the record that the police and Bizovi "took some action, beyond merely listening, that was

designed deliberately to elicit incriminating remarks."  *Kuhlmann v. Wilson,* 477 U.S. 436, 459

(1986).  Instead, Price volunteered the information to Bizovi.  Therefore, Dathan Price's

comments to Daniel Bizovi were not "testimonial."

When nontestimonial hearsay is at issue, the Court looks to *Ohio v. Roberts*, 448 U.S. 56

(1980), and its progeny. *United States v. Johnson*, 440 F.3d 832, 843-44 (6th Cir.), *cert. denied*, __ U.S. __, 127 S. Ct. 48 (2006). Pursuant to *Roberts*, an out-of-court nontestimonial statement is admissible "against a criminal defendant if (1) the declarant is not available for cross-examination at trial, and (2) there are adequate 'indicia of reliability,' either in the form of (a) the satisfaction of a firmly rooted hearsay exception or (b) particularized guarantees of trustworthiness." *Id.* at 844.

The declarant, Dathan Price, was not available for cross-examination because he was a co-defendant, who exercised his right not to testify at trial. The question then is whether Price's statements to Bizovi had indicia of reliability. The hearsay exception for statements against interest is not considered firmly rooted in this Circuit. *Id.* (citing *United States v. Franklin*, 4154 F.3d 537, 546 (6th Cir. 2005)). Therefore, the only "indicia of reliability" that could satisfy the second prong of *Roberts* is "particularized guarantees of trustworthiness."

The Michigan Court of Appeals noted that:

[Dathan] Price's statement to Bizovi were made voluntarily, shortly after the events referenced. Bizovi may be characterized as a confederate and, because defendant Price was seeking "legal" advice concerning this case, he was someone to whom defendant Price would likely speak the truth. In this context, defendant Price did not have a motive to lie. Bizovi did not prompt defendant Price or inquire concerning the events. Although defendant Price tended to somewhat minimize his role in the events and shift blame to defendants Hayes and Wright, he admitted participating in the offense and firing the first shot. Lastly, there is no indication that he made the statements to avenge himself or curry favor.

*Wright*, 2004 WL 2119686, at *2. This Court agrees for the reasons given by the Michigan Court of Appeals that Dathan Price's conversations with Daniel Bizovi carried particularized guarantees of trustworthiness. Therefore, Petitioner's right to confront the witnesses against her was not violated by Bizovi's testimony concerning what Dathan Price told him.

### G.  The Victim's Intent

Petitioner claims that the trial court erred when it admitted testimony concerning Theodore Wright's intent to initiate divorce proceedings and to change the beneficiary of his life insurance policy unless Petitioner wished to continue their marriage.  The Michigan Court of Appeals determined that the evidence was properly admitted.

#### 1.  The State Law Claim

Petitioner states that evidence of Theodore Wright's intent was inadmissible hearsay because his state of mind was not an issue in the case.  Habeas corpus review ordinarily does not extend to state court rulings on the admissibility of evidence.  *Fuson v. Jago,* 773 F.2d 55, 59 (6th Cir. 1985).  "Trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment."  *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004).  Evidence that Mr. Wright intended to change the beneficiary on his life insurance policy was not fundamentally unfair because it supplied a motive for Petitioner's actions.

#### 2.  The Constitutional Claim

Petitioner argues that the disputed evidence also violated her constitutional rights to due process of law and to confront the witnesses against her.  Theodore Wright's remarks about his intention to change the beneficiary on his insurance police was not "testimonial" because it was made to a cousin and a close acquaintance.  *See Crawford*, 541 U.S. at 51 (stating that, "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not").  Because nontestimonial

hearsay is at issue, Petitioner must show that (1) Theodore Wright was not available for cross-examination at trial, and (2) his statements fell within a firmly rooted hearsay exception or contained particularized guarantees of trustworthiness. Theodore was not available for cross-examination due to his death, and his statements to two witnesses were admissible under the hearsay exception for a declarant's state of mind. *See* Mich. R. Evid. 803(3). This exception to the hearsay rule is a firmly rooted one. *Horton v. Allen*, 370 F.3d 75, 85 (1st Cir. 2004). Therefore, Petitioner's rights under the Confrontation Clause were not violated.

### H. Cumulative Effect

The eighth and final claim alleges that the cumulative effect of the errors committed at trial deprived Petitioner of her right to a fair trial. Specifically, Petitioner contends that the irrelevant testimony, the prosecutor's improper remarks, the inadequate jury instructions, and charges that the jury should not have considered combined to deprive her a fair trial. The Michigan Court of Appeals concluded on review of this claim that, although some errors occurred at trial, their cumulative effect did not deprive the defendants of a fair trial.

This Court finds no merit in Petitioner's claim because "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002). Constitutional errors that would not individually support habeas relief simply cannot be cumulated to support habeas relief. *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005), *cert. denied*, __ U.S. __, 127 S. Ct. 557 (2006).

### V. Conclusion

The state appellate court's rejection of Petitioner's claims did not result in an unreasonable determination of the facts or in a decision that was contrary to, or an unreasonable

application of, Supreme Court precedent.  Accordingly, the petition for a writ of habeas corpus

[Doc. 1, May 30, 2006] is DENIED.


                              s/Nancy G. Edmunds
                              Nancy G. Edmunds
                              United States District Judge

Dated:  May 28, 2008

I hereby certify that a copy of the foregoing document was served upon the parties and/or
counsel of record on May 28, 2008, by electronic and/or ordinary mail.

                              s/Carol A. Hemeyer
                              Case Manager